Our last case on calendar is Velasquez-Samayoa v. Garland, 21-70093. Each side will have 15 minutes in this case. Good morning, Your Honors. Jeanne Reese, USC Immigration Clinic, Pro Bono Counsel for Mr. Miguel Velasquez-Samayoa. Mr. Velasquez is a 43-year-old man who has lived in the United States since he was 3 years old, and he is a former White Friends gang member. Dr. Bowerman, who was stipulated to as an expert witness, qualified as an expert, and expressly found credible, testified that Mr. Velasquez faced a high risk of egregious physical harm and probable death from Salvadoran authorities or gangs in El Salvador on account of a combination of factors, including a very obvious front-facing White Friends gang tattoo on his neck, the historic rivalry between the MS-13 and White Friends. Also, White Friends is no friend to the Barrio 18, the two biggest gangs in El Salvador. The age of Mr. Velasquez, as a gang member in gang culture, reaching a record, he is of an older age, and he would be perceived as a gang leader. In addition to the fact that he's, you know, essentially his whole life in the U.S. and therefore has American characteristics and manners. This court's scope of review is limited to the board's decision and the express grounds stated in the board's decision. Here, the board's decision affirming the immigration judge's denial of Convention Against Torture Protection is basically a groundless rejection of expert testimony, citing two facts not in the record, irrelevant facts, or facts that actually corroborate Dr. Bortman's testimony. An example of this is the board found that Mr. Velasquez did not face torture from gang members because he is, White Friends is a Sereño gang, and Sereño gang members can associate with Salvadoran gangs or avoid gang violence. And this is not in the record. Nowhere in the record does it say White Friends is a Sereño gang. Nowhere in the record does it say Sereño gang members can avoid gang violence, only that they try to. And it's also irrelevant because Mr. Velasquez is not a Sereño gang member. Another example of the board's groundless rejection of Dr. Bortman's testimony is finding that Dr. Bortman's testimony that Mr. Velasquez is at a higher risk because he'll be perceived as a gang member lacks corroboration. And Dr. Bortman was expressly found to be credible. His testimony is accepted as true. And the board fails to explain or provide a reasoned explanation as to why corroboration is needed. Further, it is corroborated in the record and certified administrative record at 942. The same UNHCR report that the board refers to regarding Sereño gang states that older gang members, senior members, call the shots basically, are giving orders to the younger gang soldiers. But can I ask you, you've been focusing a lot on the expert, but I thought there was another point in your argument, which was about the aggregation of the risks. So it seems like the board treated there being like one chain of causation, and actually, as I understand it, you're arguing there are at least two chains of causation that should have been added and should have been disqualified. Is that right? Yes. So Mr. Velasquez faces torture based on a variety of different ways. And one of those ways is in contact with Salvadoran authorities, whether at the airport or, as Dr. Bowman testified, in the community where he will live, either in the short term or the long term. Another avenue of torture to Mr. Velasquez is based on contacts with gang members and reprisals, or contact with gang members in a jail or prison setting after being arrested by the police, either at the airport or in the community in El Salvador. Other sources of torture are these. If we were to agree with you that there was this error in thinking about aggregation, do you think the case needs to go just back to the BIA or all the way back to the IJ? Is the record developed enough that the BIA could aggregate appropriately at this point? So I think the remand should go back to the immigration judge because the immigration judge never made fact-finding regarding the aggregation and just said this is a series of suppositions and cited to JFF. And the board never really explained the JFF rationale, and so I think it would have to go all the way back to the immigration judge. Another issue with this kind of JFF is there is testimony regarding these different sources in the aggregate that's provided by Dr. Borerman and also supported by country conditions, corroborated by country conditions, and so it's very distinguishable from JFF where there was really kind of one event that had to happen. So, for example, that JFF wouldn't get his medication and then become violent. It looked to me like the IJ thought that a number of different steps had to occur, which he said were speculative. First, that he'd have to be detained at the airport when he arrived by the authorities. Second, that he would be taken into custody. Third, that he would be harmed while he was in detention. And if he wasn't, fourth, taken into custody and placed back in the community, he'd still face a risk of harm from all these gangs. Rather than recognizing that these might be distinct potential sources of torture. That's correct, Your Honor. And another issue is this gang tattoo that the board fails to mention in its decision. And Dr. Borerman testifies, no one can look at that tattoo. Authorities, gang members, right? Right. In acrylic. Right. In the kind of calligraphy gang style that Dr. Borerman said, no one can look at that. It's very hard to hide that in El Salvador. Right, anything other than gang membership. And so his being identified as a gang member by Salvadoran authorities or gang members isn't limited to information passed on by the U.S. to Salvadorans. Even though Dr. Borerman testified, that's usually the protocol that's followed. The board also talks about Dr. Borerman's testimony regarding him, sorry, Mr. Velasquez being perceived as an older gang member as being contrary to record evidence. And that's not correct. There is record evidence that youth and children are targeted for recruitment by gang members. But that doesn't contradict what Dr. Borerman is saying, based on the particular characteristics of Mr. Velasquez. And so there is evidence in the record regarding, as I said, the older age being perceived as a gang leader. And also the court fails to take into account the individualized circumstances present in Mr. Velasquez, that not only is he older and has this enormous gang tattoo that is going to make him look like a gang member to everyone he encounters in El Salvador, but he is very Americanized. So he will stand out as a deportee. Tell me what that is. I've seen that before in cases that I'm trying to figure out. You know, what is it that would mark him as an American? What kind of mannerism, the way he talks, the way he holds his Starbucks coffee? I mean, what is it? I think it's kind of this generic idea that somebody who has spent their whole life in the U.S., and to be dropped into Salvadoran culture, even though he is a Salvadoran national, he doesn't follow those kind of cultural norms that somebody who lives in El Salvador and is brought up in El Salvador. So I think it does include the way you shake hands. I think Dr. Borerman referred to the way you shake hands, the way he dresses, the way he may intonate in speech. So I think it's just this. It would be apparent to somebody who is an outsider. If he was an outsider who had come back. He's an outsider. And then coupled with the gang tattoo, in a community that is wracked by gang violence, it would lead to a very high risk of torture. Has there been any attempted mediation in this case? There has not. Would that be fruitful? I would be open to mediation. So I don't know if it would be fruitful, but I definitely would be open to that. Okay. And then finally, I would say that this case is similar to Cole v. Holder, where there is this kind of failure of considering all the sources in the aggregate, and that would include not only the airport officials and potential prison guards and prison officials, police in the community, but also these extrajudicial kind of killing groups that are directed by police, as well as the gang members. I don't know if the court is interested in the acquiescence issue, but I think the record is clear that the gangs control, being our president, 90% of El Salvador, that they control large swaths of the community, that they are used almost as a tool by Salvadoran officials. Was it the agency's response to that, that the government had been making some inroads with anti-corruption police and actually prosecuting some of these corrupt officials? Yes, I think that the immigration judge, or it's the board, kind of acknowledges that there's this wish, but it hasn't been effective because of a lack of will. And I think in viewing the totality of the evidence regarding the corruption and the control and power that the gangs exert in El Salvador, that this kind of intention to address the gang power isn't sufficient to show that there wouldn't be visible full blindness to his torture. Especially as a case of BIA decision, they kind of say even if there is acquiescence, the problem is really this hypothetical links in the chain not being enough to the 50% level. So I'm not sure the board even relied on the lack of acquiescence. I agree with you, Your Honor. I think that I would interpret it as even kind of conceding that the acquiescence analysis was not sufficient in the lower court because there is this focus on this chain of events that are hypothetical, and I think that this is very different in this case. I'd like to preserve the rest of my time for rebuttal. Thank you.  I'll hear from the government. Thank you, Your Honor. I'm here to support Sarah Wickey on behalf of the Attorney General. And this case involves a failure of proof. Substantial evidence supports the agency's determination that the petitioner failed to prove he would more likely than not be tortured, and that his evidence does not show that any step in his hypothetical chain of events is more likely than not to occur, much less that all steps are more likely than not. Why are you having chain of events be a singular? Isn't the error here that there should have been more than one chain of events considered, and the agency erred by looking at it as a singular chain? Your Honor, we would interpret the chain of events phrase in matter of JFF not to require that all of the events happen sequentially and that only one claim can be made in one chain of events, but simply that when a petitioner alleges many different types of events that may occur, that those all need to be more likely than not to occur. So it doesn't necessarily mean that the chain has to be a singular. But it makes sense mathematically. It makes sense mathematically for a chain of events to need each one to be at least more likely than not, because you're going to multiply the probabilities, if it's a single chain of causation, like the police will find him at the airport and then the police will torture him. But if there's an entirely separate chain of events, someone in the community will find him and then this will happen. Why would you possibly multiply those? It makes no sense. Your Honor, I think if your interpretation is that each chain of events has to be more sequential in nature, then you would be correct. There are many chains of events in this case. However, it's still the government's position that none of the chains of events, each link within each of the chains, has been proven more likely than not. But it looked to me like the IJ, let me use this with a building block analogy, it looked to me like the IJ just stacked the building blocks one event block at a time in one stack of blocks. And I think what Judge Freeland is asking you is aren't there separate blocks that, I mean he could face torture from the police, he could face torture from rival gangs, he could face torture from prison officials or other inmates in the prison, or he could face torture from extrajudicial killing squads. And the agency seems to have lumped them all together in one stack of blocks, saying that each of those had to occur before they could conclude that it was more likely than not that he might be tortured if returned. Your Honor, the agency here did not assume that every single event that the petitioner described would have to occur in order for him to meet his burden. But he does have a burden to demonstrate that torture is more likely than not. I think it is an interesting challenge analytically to describe because, you know, points have been made, and I would like to discuss in more detail, the law on showing that this torture should be considered cumulatively as well as individually. And in that sense, it is appropriate to consider everything as a group. However, the agency here considered the likelihood of each scenario that the petitioner described. And in doing so, considered this important case, matter of JFF, that does point out that each of the types of factual scenarios that the petitioner is concerned about, each has to be proven more likely than not. And it's the government's position. The total risk of torture has to be more likely than not. So if you have a chain of causation that they're going to catch him at the airport, they're going to torture him at the airport, if that's 40% likely to happen, and then separately, pretend that doesn't happen, out in the community, there's a 40% chance of likelihood that someone is going to identify him as a gang member and torture him for that reason with the acquiescence of the police. If you've got two things that are 40% likely to happen, don't you end up with something like 80% likelihood of torture, even though neither one of them is more than 50? Your Honor, I do think that supplemental briefing would be needed on this circuit's law, if any. But why didn't he like it in the first place? This was the argument they were making, as I understand it. So why should you have a second chance to respond to this, which was the point of the briefing? Yes, Your Honor, that point is well taken. I'm afraid I can't explain today why that issue is not briefed in more detail in our brief. I do think that the court can rule on these issues with the briefing from both sides that you have. I was going to give you an idea, if we gave you a chance for more briefing, how would you answer my question in the briefing? What would you say about why 40 and 40 don't add to 80? Your Honor, I think there is case law in some other circuits about how cumulative risk calculation is multiplying the different risks rather than adding them together. I think also that the whole case... Is it in a single chain, or is there someone saying even if it's an entirely separate series of events, we still multiply them? Is there any circuit that has said that? Would you mind repeating your question, Your Honor? Is there any circuit that has said if you have entirely different risks, one source of risk that's entirely separate from another source of risk, that you don't add those together? Your Honor, I do believe I have some legal sources of authority that indicate that. I would need one moment to try to look that up, and I do apologize. I agreed it's not in our brief, and I do apologize for that. I do think other circuits have said that events are considered to have separate significance that are not overlapping, and that their cumulative effect is calculated by multiplying them. The problem I'm having with your argument is that because of the tattoos, this guy is walking around in El Salvador with like a walking billboard that I'm a gang member, and they're not going to believe him when he tries to tell them that he has renounced his evil ways while he was in prison and has reformed and now doesn't believe it. And if he's perceived to be a gang member, he is at risk in virtually all areas of El Salvadoran society, from the police, from rival gangs. The community is going to perceive him as a gang member from potential death squads. I mean, I don't, whether we add building blocks or consider them to be separate, I think he may have a pretty compelling case here for risk of harm if he's returned. Your Honor, in response to your question, and also to touch on something that was addressed earlier, the agency is not contending that this petitioner's face tattoos are not visible or they're not significant. Neither the board nor the immigration judge contended that he would not visibly have gang tattoos. However, I think your question also points to some problems with the expert's testimony in this case that were evaluated by both the immigration judge and the board. One of them was that as the expert Berman credibly testified, however, you know, as we know, in a matter of MAMZ and also a recent Supreme Court case named Nye, the agency handed away credible expert testimony, which he gave, with also all the other evidence in the record to conclude it was not sufficient or persuasive enough, and what happened here is that he testified. Minkai wasn't about expert testimony, was it? Minkai was about the actual petitioner, I think. Your Honor, I'm citing Minkai. I don't believe it was. Thank you, Your Honor. We say specifically from our court, Castillo versus Barr from 2020, that is actually about the board's error in saying that Dr. Berman, if it happens to have been the same expert, that when you have an expert who's testifying credibly, it's inappropriate to discount it for a lack of corroboration because the point of having an expert is they can talk about the country. That's what they're there for. If it's credible, that is testimony that should be weighed whether or not there's other testimony because if you needed the other testimony, there'd be no point of having the expert. That's what Castillo says very specifically on this point. So I don't know how you get around that here because it seems like the agency made a Castillo error here. Yes, Your Honor. I agree with your assessment of, and I understand you're quite familiar with the Castillo case, that the entirety of the expert test is to understand the argument perhaps that Castillo should apply here and, you know, has a result against our case. However, I do think Castillo is distinguishable. It is very factually related to what we're discussing here today with expert testimony, specifically Dr. Berman. But the agency grounded its analysis in this case in other areas of the record and compared the evidence. Again, I would say properly under main guide, in order to fully understand the expert testimony, they appropriately looked to other sources in the record. And to go back to the previous question, the point I wanted to raise is that the expert witness testified that the white gang, excuse me, the white sense gang the petitioner was previously a member of has no presence in El Salvador. And that's on the record on page 198 through 99. So this understandably and reasonably led the immigration judge to try to assess, you know, there would be likely risk to someone who has gang affiliations with a gang that's not present in El Salvador. And I think that's also where the Sereno gang reference came in. And while it may be true that it's not clear that white sense is a type of Sereno gang, really what the immigration judge was trying to do there was to understand the expert's testimony that the gang that the petitioner was a member of is not present. And that seems to significantly potentially reduce the likelihood of torture, knowing that he must prove it's more likely than not he'll be tortured on that basis. It's a seriously concluding and important. What is the government's position on whether this case should attempt mediation? Your Honor, I am not aware of us having been approached to discuss that yet. I can say, speaking for myself, I am typically willing to have such a discussion. I'm not sure how fruitful it would be given the very serious nature of this petitioner's crimes. He stipulated it as being a particularly serious crime. As Your Honor, I imagine, saw in the record, there are a number of very serious convictions in this case, so I'm not really sure that that would be a fruitful discussion. My question for you is, so do I understand your position to be that even though you credit or make an adverse credibility, or excuse me, make a positive credibility determination, as to Dr. Borman, it's just like any other evidence in a trial. The fact finder is entitled to give whatever weight it thinks is appropriate to that testimony in light of considering all the other evidence in the record. And that that's what the agency did here. Is that your position?  That is our position. Under the case I mentioned, the matter of MAMZ, the immigration judge weighs the evidence as the trier of fact. And expert evidence that's credible merits full consideration, just like any other credible evidence. And that case also provides some protection for petitioners in this situation by saying that the immigration judge makes a factual finding. If the immigration judge makes a factual finding that is not consistent with an expert's opinion, it is important to explain the reasons behind the factual findings. And it's our position that the immigration judge did so in this case. And I'd like to recite some of the reasons that I see with limited time. I did want to address the issue of whether the immigration judge's decision in this case should be considered. The government does not agree with counsel's contention in their reply brief that the court's review in this case is limited to the board's decision. The petitioner appears to cite the Teckle case for the proposition that none of the immigration judge's findings should be considered in this case, or very few of them. However, it's our contention that the Teckle case is limited to the adverse credibility context. And the reason that's different is in adverse credibility, the agency is required to cite and describe specific cogent reasons that the agency must identify to support that ad hoc decision. And so it really doesn't apply in this case where both the petitioner and the expert witness were found credible. And there's really no question of that in the record. Moreover, even if Teckle does apply, this court stated in that case that the scope of review includes the immigration judge's decision where it serves as a guide to what lay behind the board's conclusions. And in this case, that would include all the immigration judge's findings regarding what the expert testimony of Dr. Berman stated. And that would be because the board's decision in its conclusion is directly cited to and relied on all the immigration judge's findings related to his testimony. Your Honor, just to touch briefly on the cumulative aspect, I do understand it's frustrating not to have additional briefing from us on that. But I think that the agency's decision, it is sufficient under some of these cases, such as Quijada Aguilar v. Lynch, 799 F. 3rd, 1303, where it states that the agency should avoid solely considering these as separate and divisible claims. But our contention is that the agency did not do that here. They did consider a proper cumulative analysis. And, in fact, it's really the petitioner's burden to prove that the agency did not consider cumulatively. And here we think their general language, talking about the overarching aspects of the claim, shows that they considered it cumulatively. Thank you, counsel. I think we have some time for rebuttal. Thank you. I just want to clarify that we're not saying that this Court should be reweighing the testimony or that Dr. Borman should be given more weight. What we're saying is that the rejection of Dr. Borman's testimony is not supported by substantial evidence in the record, that Dr. Borman was qualified or stipulated to. There was no disagreement with his qualifications, with his expertise. And the rejection of his testimony was based on facts that were not in the record. And, actually, the record as a whole corroborates Dr. Borman's testimony. So there is nothing to basically trigger the immigration judge or the board to look at record evidence to help understand Dr. Borman's testimony or conflicting with Dr. Borman's testimony. Do you agree that a fact finder basically has the discretion to give whatever weight it thinks is appropriate to an otherwise credible witness's testimony? I agree. In light of all the other evidence in the case. I agree with that. But it has to be based on the evidence. Yes. I agree. And then I would just finally conclude with, I think this case is very similar to Colby-Holder, where there is this kind of saying this is just a series of suppositions without explaining that and failing to look at all the sources and the aggregate. And that, you know, determining cat eligibility is an exercise of making this assessment of the likelihood of future torture and hypothetical future torture. And there are all these regulatory factors that have to be considered in the totality. And that was not done in this case. What's your response to counsel's characterization? I'll paraphrase that it's unlikely that mediation would be successful here because your client is basically an undesirable alien as a result of the serious criminal record that he has here in the United States. I have found in my experience that because of his criminal history, the government would not be open to any sort of prosecutorial discretion. Yeah. That's what I thought too. Thank you very much for taking the case. Yes. Thank you for doing this pro bono. We really appreciate your representation. Thank you both sides for the helpful arguments. This case is submitted and we are adjourned for the day. All rise.
judges: TALLMAN, FRIEDLAND, Korman